FILED

2008 Jun-24  PM 01:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DONALD E. BURGESS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:06-CV-0727-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. Introduction

The Claimant, Donald E. Burgess, filed applications for Disability Insurance Benefits and Supplemental Security Income ("SSI") payments on October 15, 2001, alleging disability commencing on July 31, 2001 caused by degenerative disks in his lower back, arthritis, and panic attacks. The Commissioner denied the claims. The Claimant did not file an appeal in response to the denial. On September 30, 2002, Claimant filed second applications for Disability Insurance Benefits and Supplemental Security Income payments. The Commissioner denied these second claims. The Claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing on November 15, 2004. In a decision dated May 17, 2005, the ALJ found that the Claimant should receive SSI benefits from October 7, 2004, but refused to reopen the prior adverse decision and concluded that Claimant was not disabled between July 31, 2001 and October 7, 2004. On February 17, 2006, the Appeals Council denied the Claimant's request for review. The Claimant has exhausted his administrative remedies, and

this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated

below, the decision of the Commissioner will be AFFIRMED.

## II. Legal Standard

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot

> engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected
> to result in death or which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

To make this determination, the Commissioner employs a five-step, sequential evaluation

process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the
> economy?
>
> An affirmative answer to any of the above questions leads either to
> the next question, or, on steps three and five, to a finding of
> disability.  A negative answer to any question, other than step three,
> leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520,

41.920.

## III.  Standard of Review

The standard for reviewing the Commissioner's decision is limited.  This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if his factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g);

*Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999

(11th Cir. 1987).  "No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*, but will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings.  *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but must also view the record in its entirety and take account of evidence that detracts from the evidence on which the ALJ relied.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. Facts

The Claimant was fifty-two years old at the time of the administrative hearing and has a ninth grade education.  (R. 22, 870, 868).  His past work experience include a fishing coach, a house mover, and an auto body repairman.  (R. 255, 870, 878).  Initially, the Claimant alleged that he became disabled on July 31, 2000; however, on November 15, 2004, Claimant amended his onset date to July 31, 2001.  (R. 71, 78).  According to Claimant, his alleged disabilities are due to degenerative disks in his lower back, arthritis, and panic attacks. (R. 22, 871, 876).  Claimant testified that he worked part-time at a body shop, two to three hours per day, two to three days per week.  (R. 870-71).  The ALJ found that this work did not constitute substantial gainful activity.  (R. 22-23). No evidence indicates that Claimant has engaged in substantial gainful activity since the amended alleged onset date; however, he may have engaged in

intermittent work activity up to the day before a motor vehicle accident on October 7, 2004.  (R. 870-71).

The Claimant testified that he first applied for Social Security benefits in November 2001, and that he was denied in February 2002.  (R. 876-77).  He stated that he gave his information to an attorney, who refused his representation; however, he lost her letter when he moved.  (R. 877).  The record shows that his most recent applications were filed in September of 2002—seven months after the denial.  (R. 74).

The medical evidence considered prior to the October 15, 2001 application shows that Dr. Phillip C. Watkins treated Claimant intermittently from March 1, 1988 to April 11, 1996 for mitral valve prolapse.  (R. 210-219).   The Claimant's graded exercise testing results were normal on September 19, 1990, and he failed to appear for several appointments.  (R. 210-219). Dr. Walter B. Brumleve, M.D., Claimant's family physician, treated him from September 29, 1998 to September 11, 1999 for back pain, headaches, hypertension, arthritis, and panic attacks. (R. 220-24).  Medication included Vicodin, Tenormin, and Klonopin.  (R. 220-24).  On May 13, 2000, the Claimant went to the emergency room with chest pain; however, no diagnosis other than chest pain was made.  (R. 225-27).

Claimant consulted Dr. C.L. Holloway on November 14, 2000, when he was given Lortab 7 with three refills for back pain and a referral to the Quality of Life Health Clinic because he lacked insurance.  (R. 258-67).  Dr. Holloway noted on July 16, 2001 that the Claimant still complained of back pain, and he was concerned that Claimant was a "drug seeker" and declined to provide him with pain medication.  (R. 258-67).  He referred Claimant to Rehabilitation Services; however, the ALJ found no evidence in the record that he followed up with the recommendation.  (R. 258-67, 23).

4

Emergency room records dated July 1, 2001 indicate that Claimant complained of neck, shoulder, back, left hip, and left leg pain, and Claimant was given an injection of Toradol and a prescription for Lortab 10.  (R. 386-419).  Claimant was referred to Dr. T. Scott Powers, associated with Workfirst Occupational Health Center, where Claimant was examined on July 6, 2001.  (R. 228-34).  Claimant's diagnoses were chronic lower back pain with probable degenerative changes; bilateral leg pain not considered likely to be radicular or due to a neurological lesion; chronic neck pain without good evidence of radiculopathy; right shoulder pain, possibly due to rotator cuff impingement, x-ray findings negative; bilateral hand pain and numbness possibly due to carpal tunnel syndrome; and history of depression and panic attacks. (R. 228-34).  Claimant last sought medical attention from Dr. Powers on August 2, 2001.  (R. 228-34).  Dr. Brumleve noted on October 3, 2001 that the patient had ample time to seek pain management and that he could give the Claimant referrals but did not have any further treatment for Claimant's pain.  (R. 235-52).

In connection with his most recent application, Claimant submitted medical evidence consisting of emergency room records dated May 13, 2000.  (R. 225-27).  Records dated December 16, 2000 show that Claimant was out of his pain medications and "need[ed] prescriptions for Klonopin and Lortab."  (R. 455-593).  Claimant received a prescription for cough medication and five Klonopin doses; he was referred to Dr. Marion Belk, who diagnosed him with chronic back pain and anxiety.  (R. 455-593).  The ALJ concluded that none of the evidence submitted showed findings inconsistent with medical evidence considered in the October 15, 2001 decision.  (R. 24).

Rather, the ALJ determined that, based on these facts, neither good cause nor any other basis to reopen the prior decision exists.  (R. 24).  As a result, the ALJ did not reopen the

decision dated February 26, 2002, and the ALJ determined that the 2002 decision stands as the final decision of the Secretary on the Claimant's applications of October 15, 2001. (R. 24).

Regarding the current applications that are the subject of this appeal, Claimant testified that he was diagnosed with mitral valve prolapse in the late 1980's, which caused panic attacks that are increasing in severity. (R. 871). He also stated that his heart races; he experiences tunnel vision; he is nervous; and he feels as though he is dying. (R. 871-72). Claimant's attacks became weekly, although they were not as severe, due to weakness, nervousness, and an inability to concentrate. (R. 872).

The Claimant said that he has suffered from degenerative joint disease in his back for ten years, and in June 2002, he fell and aggravated his back trouble. (R. 873-74). Claimant said he has left-sided headaches since 2002, for which he uses over-the-counter medication. (R. 874-75). Claimant also stated that his hands are numb in the morning, which decreases his grip; his feet are numb and tingle; he drops things; he has knee and left hip pain; he went to Vocational Rehabilitation; and he had an MRI scan by Dr. Clark. (R. 875-76).

Claimant testified that, prior to a car accident in October 2004, he could lift; sit a couple of hours with position changes; walk one-forth of a mile or less; and stand; with pain at about 3 to 5 out of 10 with medications, and 8 out of 10 without medication. (R. 884-87). Claimant said he now is always in pain, and his pain is at a level of 10 on a scale of 0 to 10, although it lessened after he stopped working. (R. 878). He used prescription pain medications, including Vioxx and Lortab, and Claimant had some alcohol problems in the past. (R. 878).

At the time of his application, Claimant completed a Daily Activities Questionnaire on December 6, 2002, in which he stated that his back pain was severe. However, Claimant managed to wash dishes and iron; read or watch television two hours per day; either drive or ride

with someone every day; care for a small dog, including feeding it and bathing it; and cook occasionally, although he had a hard time reading recipes. (R. 124-33).

At the time of the hearing, the Claimant was married and lived in a subsidized apartment. (R. 882). He stated that he rises around six o'clock a.m.; takes his son to school; sits with his daughter, who has spina bifida and has been bedridden and paralyzed since birth; and picks his son up after work. (R. 883-85). For six to eight months after the October 2004 accident, he ate with his son or his son brought food home. (R. 885). After the October 2001 application, Quality of Life Heath Services examined Claimant and found that his lower back was tender and his leg elevation was limited. (R. 594-609). Claimant was referred to Social Services and/or Vocational Rehability for an MRI scan. (R. 594-609).

On January 12, 2002, Dr. Will R. Crouch examined the Claimant as a consultative physician. Claimant's chief complaint was of lower back pain that radiated into his left leg to his foot. Other complaints included: neck, head, and left shoulder pain; weakness in the right hand; and frequent panic attacks. Claimant's physical examination was normal except for slight decreased right hand grip; positive straight leg raising at 45 degrees on the left; and slight reduction of back range of motion. However, Claimant could manipulate small objects and walk without assistance. His neurological examination was negative. Dr. Crouch's impressions were chronic low back pain probably secondary to degenerative disk disease; depression; mitral valve prolapse by history; and panic attacks by history. (R. 253-54).

Dr. Barry Wood, Ph.D. performed a consultative psychological examination on January 23, 2002. Dr. Wood noted that the Claimant had no valid driver's license, secondary to DUI charges seven years earlier; however, Claimant reported that he nevertheless drove as needed. Claimant admitted to occasional alcohol consumption, but less than in the past; he gave no

7

compelling reason for his decision to decrease his level of alcohol use.  He reported that he had abused marijuana and alcohol since his teens, and he gave a history of panic attacks with a frequency of one every two weeks at the time of the interview.  His daily activities included household chores such as washing dishes, sweeping, preparing simple meals, vacuuming in limited increments, and taking out the trash.  His hobbies included watching his son play ball, and he spent most of his time with his family.  Claimant began the interview with an anxious demeanor; however, he progressed to a normal disposition and even laughed at times.  His long-term memory was intact, and his IQ was average to low average.  His description of panic attacks was "compelling," although this did not appear to be a limiting factor.  Dr. Wood's diagnoses included alcohol dependence in early partial remission by report; anxiolytic dependence by report; and panic disorder without agoraphobia.  His GAF was 72, which indicates no more than slight impairment of social, work or school functioning, and only transient symptoms in response to stressors.  (R. 255-57).

Claimant returned to Dr. Holloway on April 2, 2002, and he stated that he took Klonopin for mitral valve prolapse.  Claimant asked for pain medication, complaining of chronic back pain, and Dr. Holloway gave him Lortab 7 with one refill and referred him to the Department of Rehabilitation Services.  Claimant received prescriptions for Lortab on May 2 and June 25, 2002; however, Dr. Holloway declined a prescription for Methadone.  Claimant was referred to the pain clinic on August 1, 2002, and the only prescriptions he received were Klonopin and Tenormin for hypertension.  (R. 258-67).

Claimant presented at the mental health center on May 2, 2002, where he appeared anxious and depressed with a blunted affect and reported sleep disturbance and physical problems.  He appeared unable to concentrate, and only moderate problems were noted in

8

personal hygiene and with social withdrawal.  Claimant's diagnoses were major depressive
disorder without psychotic features, with suicidal thought, and a panic disorder without
agoraphobia.  His GAF was 45, and a treatment plan was set up; however, Claimant did not
follow up, causing his case to be closed.  (R. 688-95).

Vocational Rehabilitation Services referred Claimant to Dr. Charles H. Clark, III, a
neurosurgeon, who examined Claimant on May 28, 2002.  Claimant's complaints included lower
back pain extending into his hips and legs, with numbness in his legs, worse on the right.
Claimant's neurological examination was negative without evidence of dermatomal loss, and his
straight leg raising was positive at 45 degrees on both sides.  His diagnosis was probable
degenerative lumbar disk disease, and Claimant received Bextra.  On July 29, 2002, Dr. Clark
interpreted a lumbar MRI scan performed on July 18, 2002, which showed slight desiccation of
several lumbar disks but no frank herniation.  He also noted left-sided bulging at L5-S1, and
Claimant received Medrol Dose Pack.  Vocational Rehabilitation was requested to approve
referral to a physiatrist for evaluation.  (R. 268-72).

Claimant went to the emergency room on June 20, 2002, reporting that he had fallen
while getting out of the car and had low back pain radiating into the legs and neck.
Lumbosacral, cervical, and pelvis x-rays were negative for acute injury with only minimal
degenerative changes except for cervical osteophyte formation at C5-6.  The diagnoses were
status post fall, low back pain and neck pain, and Claimant received an injection of Toradol and
was advised to consult his family doctor.  (R. 286-306).

Emergency room records from a different hospital show that on August 10, 2002 the
Claimant received treatment for a reported head injury sustained in a fall, and edema was
present.  A head CT scan revealed a minimally displaced comminuted left orbital fracture, and

Claimant received an injection of Demerol and Phenergan, which was repeated later; Midrin for headaches with two to go; and a prescription for Phenergan suppositories.  On September 29, 2002, Claimant went to the emergency room with complaints of paresthesia and back pain, and an examination revealed diffuse lumbosacral back pain; deep tendon reflexes were symmetrical; and no focal weakness was found.  The only noted diagnosis was back pain, and Claimant received an injection of Toradol.  (R. 273-85, 455-593).

The Claimant went to the emergency room on October 20, 2002, complaining of back pain present for "a few years," and stating that he ran out of Lortab.  Although Claimant noted a history of degenerative disk disease with radicular pain, he had no incontinence or other neurological signs, and the context of his complaint concerned his lack of pain medication. Claimant received an injection of Toradol and Decadron, and the doctor noted that Claimant took Klonopin, Tenormin, and Lortab 7.5.  Claimant returned to the emergency room on October 28, 2002, again complaining of back pain, and he said that he was unable to go to the pain clinic and that he had received Lortab and Prednisone the previous week.  Claimant received another injection of Toradol and was referred to another physician.  His complaints remained unchanged on November 1, 2002, except that he reported left knee pain.  He received Tramadol and was referred to Dr. James R. Matter, an internist.  (R. 286-306).

Dr. Don Cornelius, on a referral from Dr. Holloway, evaluated Claimant at the pain clinic, and he noted herniated disks at L4-5 and L5-S1.  He also noted that the Claimant had degenerative disk disease in the cervical and lumbar spine.  Claimant began Elavil, Soma, and Methadone, which were likely to work and be "relatively cheap."  Dr. Cornelius also advised Claimant to use over-the-counter Ibuprofen.  (R. 420-54).

On January 4, 2003, Claimant went to the emergency room with complaints of arthritis,

degenerative disk disease and a mitral valve prolapse.  He reported that he ran out of Klonopin, Methadone, and Tenormin.  He received a dose of Ativan and was advised to consult Dr. Holloway.  (R. 455-593).

Claimant returned to Dr. Cornelius on January 6, 2003, when a urine drug screen from the previous visit revealed Meprobamate, Methadone, Codeine, Naproxen, and Atenolol. Claimant stated that he had taken medication prescribed for other people to help with his pain and that his pain continued to be about a 7 out of 10.  Dr. Cornelius increased Claimant's Methadone to 30 mg per day, he changed his sleeping medication from Elavil to Trazodone, and he continued Claimant's Soma.  On February 3, 2003, Claimant returned, and his urine drug screen was "fine."  His pain changed very little—averaging a 6 out of 10—and his medications were increased to 40 mg of Methadone and 50 mg of Trazodone per day, in addition to the new prescription of Neurontin.  (R. 420-54, 696-701).

Claimant went to Quality of Life Health Services on February 14, 2003, with complaints of difficulty breathing due to a panic attack.  The physical examination findings included tachycardia and a rash.  The assessment was mitral valve prolapse, hypertension, chronic pain, and panic attacks, and Claimant received Tenormin and Klonopin.  Claimant was also asked to avoid caffeine and over-the-counter cold medications.  Dr. Joseph R. Jowers, a family physician, supervised Claimant's treatment.  (R. 594-609).

On April 28, 2003, at the emergency room, Claimant complained of back pain that was aching, throbbing, radiating down both legs, and a 10 on a scale of 10.  Claimant received an injection of Toradol and Motrin 600.  Back pain was the diagnosis.  Claimant's complaint had not changed on May 19, 2003, and he received an injection of Demerol and Phenergan.  (R. 455-593).

Claimant returned to Dr. Cornelius on May 30, 2003, reporting an unchanged level of pain.  He was "unable to afford" the Neurontin and stopped taking it as a result.  Claimant received samples and a prescription for Zonegran.  (R. 420-54).

At Quality of Life Heath Services on June 11, 2003, Claimant complained of increased panic attacks and headaches with vertigo.  He said he stayed depressed and reported suicidal ideation without plans.  He complained of ringing in his ears and impacted earwax was removed. Claimant received Neurontin, Klonopin, Omnicef, Astelin NF, Adivair, and Zoloft; Claimant was advised to return in two to three weeks.  (R. 594-609).

On August 1, 2003, Claimant returned to Dr. Cornelius, reporting slight improvement in his back pain, to an average of about 6 out of 10.  He had other areas of pain, including his elbows and neck.  Dr. Cornelius made arrangements for Claimant to receive Neurontin free of charge, and the prescription was increased to 600 mg three times per day.  He did not make any other changes in Claimant's medications.  Claimant said he was helping his son rebuild an automobile.  (R. 420-54).

On October 26, 2003, Claimant went to the emergency room, complaining of chronic back and leg pain.  He used a wheelchair to enter the emergency room, and an examination revealed that Claimant was within normal limits.  Claimant became hostile when advised that his pain medications would not be refilled, and he left walking.  He returned to Dr. Cornelius on October 31, 2003, with little to no change in his symptoms except for side effects Dr. Cornelius thought were due to Neurontin, which was discontinued.  (R. 420-54).

The Claimant went to Quality of Life Health Services on November 25, 2003, stating that he was out of medication and had pain in his left shoulder blade and head.  He was very shaky without evidence of recent injury, and he reported that he had been working on a car the previous

week.  He described his pain as 6 out of 10 and reported that he was not using pain medications.

His examination had normal results, except for tightness in his lower cervical area.  Claimant

received samples of Vioxx and a prescription of Klonopin.  Claimant returned on December 10,

2003, still complaining of left shoulder pain and panic attacks.  He stated that his pain was 5 to 6

out of 10, reported that he was not using pain medication, and requested a prescription.  His

diagnoses included left shoulder pain, alcohol abuse, and asthma/COPD, and Claimant received

samples of Vioxx, and prescriptions for Zoloft and Q-Var.  Claimant was advised to start AA,

avoid second-hand smoke and alcohol, and to consult a counselor at the mental health center.

(R. 594-609).

        Claimant returned to the emergency room on January 4, 2004, with the complaints of

anxiety, lack of Klonopin (he ran out two weeks prior), and a feeling of impending death.

Claimant received an injection of Vistaril and Zoloft and was advised to follow up with his

regular doctor.  (R. 455-593).

        On January 30, 2004, Claimant returned to Dr. Cornelius; he stated that he had new

housing and that his living situation was much more stable.  Claimant also stated that he was not

able to work, and that he was taking medication; however, the drug screen from the previous

visit did not show any medication.  Dr. Cornelius was also unable to contact Claimant regarding

a pill count.  Claimant's prescription for Klonopin was changed to Imapramine.  Claimant called

on March 17, 2004, and reported waking up at about two a.m. every night with increased pain

from his right hip down his leg to the foot, with numbness and tingling.  Claimant went to the

office on March 26, 2004, when he stated that his pain were exacerbated by increased activity.

Dr. Cornelius noted that Claimant was "still a paint and body man and he [was] answering the

phones, going out with a guy to bring a car back to the shop . . . "  Dr. Cornelius increased

13

Claimant's Imapramine and gave him Keppra samples instead of Neurontin.  He returned on April 23, 2004, when Keppra was changed Trileptal.  He said that his pain was a level of 8 out of 10, and he complained of running out of medication.  (R. 420-54).

On April 26, 2004, Claimant went to Quality of Life Health Services and requested refills on his medications.  He received renewals of Klonopin and Tenormin, and he started Effexor.  Soma and Methadone had been previously prescribed by Dr. Cornelius, and Claimant went to Dr. Cornelius' office on July 19, 2004 for medication renewals.  (R. 420-54).

On October 7, 2004, Claimant was hospitalized after an automobile accident.  The admitting diagnosis was multiple trauma with open right tibia/fibular fracture; left metatarsal fractures; facial fractures and numerous contusions.  He had surgery for open reduction, internal fixation, irrigation and debridement of the right leg fractures, and he was discharged in a wheelchair on October 11, 2004.  He underwent outpatient surgery on October 15, 2004, consisting of open reduction of the zygomatic arch fracture involving the left eye.  He did not have any problems after either surgery.  Claimant returned to Dr. Cornelius on October 20, 2004, when his pain increased due to his injuries.  Dr. Steven Fuller, Claimant's treating orthopedic surgeon, examined Claimant on the same date, and his right tibia and fibula x-rays showed satisfactory alignment of the fractures; however, his left foot fractures remained unchanged.  (R. 702-09).

Claimant was referred to Dr. Powers by his attorney for independent medical evaluation to address functional ability.  On October 20, 2004, Dr. Powers observed that the Claimant was on Methadone, Lortab, Klonopin, and Tenormin.  He was still in a wheelchair and was non-weight bearing due to injuries sustained in the automobile accident on October 7, 2004, which somewhat limited the examination.  His affect was appropriate although eye contact was poor,

and he appeared very anxious and distracted.  The Claimant admitted to consuming about six beers per day.  An examination revealed normal muscle tone, decreased sensation in a glove distribution, and negative straight leg-raising.  The assessment included chronic low back pain with disk disease at L4-5 and L5-S1; chronic neck pain with spondylosis; diffuse chronic pain; long history of anxiety and panic attacks; history of alcohol dependence; possible left shoulder rotator cuff injury; right tibia/fibula fracture with external fixator and non weight bearing; left foot fracture, non-weight bearing; and numbness and paresthesias in the hands, possibly due to carpal tunnel syndrome.  Dr. Powers noted that the Claimant was totally unable to perform any exertional activity at the time of the examination; however, he was temporarily immobilized by his injuries and no evaluation of his residual functional capacity was possible.  (R. 610-20).

The Claimant returned to Dr. Fuller on November 3, 2004, when a wound infection in the lower leg fractures was apparent and alignment was no longer acceptable.  Claimant underwent surgery on November 9, 2004, to realign the fractures.  Claimant's diagnosis was osteomyelitis on November 22, 2004, he continued "nonweightbearing to bilateral extremities," and he was given Keflex in addition to Lortab.  (R. 702-09).

Dr. Powers, based on medical records beginning July 6, 2001, completed a medical assessment of the Claimant's limitations on November 22, 2004.  He opined that the Claimant could stand and walk for four hours in an eight-hour workday and sit approximately six hours. He could lift and carry up to twenty pounds occasionally and ten pounds frequently.  Based on the Claimant's impairments at the time of the examination, Dr. Powers opined that the Claimant could lift less than ten pounds, stand and walk in combination for no longer than two hours and sit no longer than four hours in an eight-hour day.  He needed to lie down occasionally because of back pain.  The Claimant returned to Quality of Life on November 30, 2004, for medications

15

and for laboratory work, which was repeated on December 14, 2004.  (R. 715-23).

In a deposition taken by the Claimant's attorney on March 23, 2005, Dr. Powers said that the Claimant, when he was first examined on July 6, 2001, reported a history of back pain for about fifteen years; he also reported multiple motor vehicle accidents.  Initially, he received treatment from Dr. Powers as a physiatrist, and he was last seen on August 2, 2001.  The MRI scan performed on July 17, 2002, was reviewed and noted as consistent with increasing degenerative disk disease.  When asked if other trauma occurred to the Claimant's back between August 2001 and July 2002, Dr. Powers indicated that it had not.  (R. 724-39).

The ALJ concluded that the medical evidence shows that Claimant suffers from cervical and lumbar degenerative disk disease and osteoarthritis; panic disorder; status post comminuted fracture of the left lateral orbital wall with closed head trauma; mitral valve prolapse; status post left zygomatic arch fracture sustained on October 7, 2004, with subsequent osteomyelitis; alcohol and drug dependence; and alcohol abuse, which considered together constitute a "severe impairment" because they have more than a minimal effect upon the Claimant's ability to perform basic work-related activities.  (R. 30).  The ALJ concluded that the Claimant's complaints of pain, panic and other symptoms are not credible or consistent with the medical evidence or his statements regarding daily activities.  (R. 37).  In addition, the ALJ determined that Claimant had some limitation, but at a moderate level.  (R. 30).  The ALJ relied upon the medical evidence and his psychiatric review technique form ("PRTF"), a standard document which outlines the steps for evaluating a mental impairment and analyzes four functional areas: (1) daily activities; (2) societal functioning; (3) concentration, pace, or persistence; (4) and episodes of decompensation.  (R. 25, 37, 38).

The VE testified that Claimant retained the residual functional capacity ("RFC") to perform light, unskilled jobs such as assembler, existing in numbers of 1500 in Alabama and 72,000 in the national economy; inspector, existing in numbers of 1000 in Alabama and 43,000 in the national economy; and bagger, existing in numbers of 800 in Alabama and 37,000 in the national economy.  (R. 38).   The ALJ determined that, through October 6, 2004 — the day prior to the auto accident — Claimant retained the ability to perform the jobs enumerated by the VE and that those jobs exist in significant numbers in the economy.  (R. 38).  Consequently, the ALJ determined that, through October 6, 2004, the Claimant was not "under a disability" at any time. (R. 38).

However, the ALJ also determined that after Claimant's accident and hospitalization on October 7, 2004, Claimant's complaints of pain, difficulty standing and walking, and other symptoms are credible and consistent with medical evidence.  (R. 40).  The ALJ stated that the symptoms and limitations resulting from his injuries, combined with his degenerative disk disease and panic disorder, have precluded his ability to engage in work-related activities at any level of exertion on a regular and continuing basis, defined in Social Security Ruling 96-8p as eight hours a day, five days a week.  (R. 39).  Consequently, the ALJ determined that Claimant has been under a disability since October 7, 2004 but not prior to the accident that occurred in that date.  (R. 39).

### V. Issues Presented

In this appeal, the Claimant argues, in essence, that he has been disabled since July 31, 2001 rather than since October 7, 2004.  Claimant identifies four specific ways in which the Commissioner allegedly erred.  First, the Claimant alleges that the ALJ erred by refusing to reopen and revise Claimant's initial disability determination dated February 26, 2002.  Second,

Claimant alleges that his mental incapacity prevented him from timely appealing his initial denial dated February 26, 2002 – an issue very much entwined with the first alleged error. Third, the Claimant alleges that the Appeals Council should have remanded his case because of new and material evidence.  Finally, Claimant alleges that the ALJ did not correctly apply the Eleventh Circuit's three-part pain standard.

## VI. Discussion

**A.    The ALJ and Appeals Council did not err by refusing to reopen, modify, or remand the Commissioner's February 26, 2002 decision based on Claimant's alleged mental incapacity or introduction of "new and material" evidence.**

### 1.    Claimant did not show good cause for his failure to timely appeal the February 26, 2002 denial of benefits.

When the Appeals Council denies review, the ALJ's decision becomes the final decision of the Commissioner.  *See Kennedy v. Bowen*, 814 F.2d 1523, 1527-28 (11th Cir. 1987); *see also Bivines v. Bowen*, 833 F.2d 293, 295-96 (11th Cir. 1987).  After a final decision by the Commissioner, the claimant may obtain review of that decision by a civil action commenced in a U.S. district court within sixty days after the mailing of a notice of the final decision.  *See* 42 U.S.C. § 405(g); *see also Bloodsworth v. Heckler*, 703 F.2d 1233, 1236 (11th Cir. 1983).  An initial determination is binding unless a claimant requests a reconsideration within the stated period of time, or the Commissioner revises the initial determination.  *See* 20 C.F.R. §§ 404.905.

To determine if a claimant has "good cause" for failing to meet a timely appeal, the ALJ considers four factors: (1) the circumstances that kept the claimant from making a timely request; (2) whether the claimant was misled by agency action; (3) whether the claimant did not understand the requirements of the Act resulting from court decisions, amendments to the Act, or other legislation; or (4) whether claimant had any physical, mental, educational, or linguistic

limitations (including any lack of facility with the English language) that prevented the claimant from filing a timely request.  *See* 20 C.F.R. § 404.911(a).

Claimant argues that he lacked the mental capacity to reasonably comprehend and respond to the denial notice for his October 2001 application.  According to Social Security Ruling 91-5, p.2, a claimant establishes mental incapacity for the purpose of showing good cause when the evidence proves that he lacked the mental capacity to understand the procedure for requesting review.  The ALJ found that no medical evidence confirmed the severity of the alleged mental defect to a degree that would justify the Claimant's misunderstanding of his denial notice.  (R. 23, 32).  In fact, after receiving the denial notice, the Claimant attempted to hire an attorney rather than contact the Social Security Office.  (R. 23).  Instead of pursuing his 2001 application, the Claimant filed a new application in September 2002.  (R. 32).  The ALJ properly found that the evidence shows the Claimant's ability to understand the Commissioner's denial of his 2001 application.  The ALJ also properly found that Claimant's filing of new applications in September 2002 shows that he understood the decision and its consequences.  (R. 23, 32).

Because the Claimant did not appeal the denial of his 2001 application, that issue is now barred by *res judicata*, which the ALJ properly concluded.  (R. 32).  The Claimant has not established good cause for failing to appeal the decision in a timely manner.

### 2.   The Appeals Council properly applied the "new evidence" standard to Dr. Powers' 2005 testimony regarding the 2002 MRI.

Claimant argues that the Appeals Council erred in not remanding his case because Claimant allegedly submitted "new and material" evidence, which consisted of Dr. Powers' reexamination of an MRI taken in 2002.

A claimant may provide new evidence to the Appeals Council if the evidence is both new and material. *See Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1990), *cert. denied*, 525 U.S. 1124 (1999); *see also* 20 C.F.R. §§ 404.970(b). For the Claimant to be successful, he must establish that (1) the evidence is new and non-cumulative; (2) the evidence is "material"—relevant and probative so that a reasonable possibility exists, that the administrative result would change; and (3) good cause exists for the failure to submit the evidence at the administrative level. *Archer v. Comm'r of Soc. Sec.*, 176 F. App'x 80, 82 (11th Cir 2006). The Social Security Appeals Council must consider new and material evidence in making its decision whether to review an ALJ's decision, and it must review the case if the ALJ's actions, findings, or conclusion is contrary to the weight of the evidence on record. *See Ingram v. Comm'r of SSA*, 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council evaluates new evidence to determine whether a basis for changing the ALJ's decision exists. *See Falge*, 150 F.3d at 1322 n. 4.

The Appeals Council reviewed the evidence without reviewing the prior application on the merits and determined that no evidence was new and material. The "new evidence" consists of Dr. Powers' testimony taken in October 2005 regarding an MRI taken in 2002. Claimant submitted this evidence after the 2005 hearing, which is why the ALJ did not address it in his written decision. When Claimant presented his "new" evidence, the Appeals Council considered and adopted the evidence into the administrative record, but found that the evidence did not provide a basis for changing the ALJ's decision. (R. 7-10). Upon review of the record, this court agrees that the evidence is not new or material and that it does not have a "reasonable likelihood" of changing the administrative result. *See Archer*, 176 F. App'x at 82. Dr. Powers had previously submitted testimony regarding the MRI on April 1, 2005, which was received

20

prior to the ALJ's May 2005 decision.  (R. 725-39).  The ALJ took Dr. Powers' testimony into

consideration when he made his decision.  Dr. Powers' "new" testimony regarding the *same*

2002 MRI, dated October 14, 2005, is not new or material because it is the same doctor assessing

the same MRI.  (R. 757-79).  In addition, because Claimant introduced the evidence during the

administrative period for the second application rather than the first, the evidence could not

apply to the first claim or justify a reopening of that claim.

> **B.**     **The ALJ correctly applied the appropriate legal standards to the Claimant's**
> **subjective complaints and his credibility determinations were supported by**
> **substantial evidence.**

Claimant argues that the ALJ did not correctly apply the Eleventh Circuit's pain standard

when considering Claimant's application and that the ALJ's reasons for rejecting Claimant's

application were not supported by substantial evidence.

Courts in this circuit must apply a three-part standard in evaluating claims of disabling

pain or other subjective symptoms.  This standard requires: (1) evidence of an underlying

medical condition and *either* (2) objective medical evidence that confirms the severity of the

alleged pain arising from that condition, *or* (3) that the objectively determined medical condition

is of such severity that it can be reasonably expected to give rise to the alleged pain.  *Foote v.

Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  This standard also applies to complaints of

subjective conditions other than pain.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.

1991).

Although this standard requires objective medical evidence of a condition that could

reasonably cause the alleged symptoms, objective proof of pain itself, or of its intensity, is

unnecessary.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  "Subjective pain

testimony which is supported by clinical evidence of a condition that can reasonably be expected

21

to produce the symptoms of which claimant complains is *itself* sufficient to sustain a finding of disability." *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  If nonexertional impairments exist, the ALJ must introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that claimant can perform.  *See Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

      If the ALJ discredits a claimant's testimony of pain, he must do so expressly and articulate explicit and adequate reasons for doing so; substantial evidence must support the ALJ's articulated reasons.  *Hale*, 831 F.2d at 1011-12.  In deciding issues of credibility, the ALJ considers objective medical evidence and information from the claimant and treating or examining physicians, the claimant's daily activities, the frequency and intensity of pain, any precipitating and aggravating factors, medication and any side effects, and any other measures taken to alleviate the pain.  *See* 20 C.F.R. §§ 404.1529(c)(2), (3); 416.929(c)(2), (3); Soc. Sec. Ruling 96-7p.

      In the present case, the ALJ found that the Claimant met part one of the standard prior to October 7, 2004, because he had underlying medical conditions of degenerative disk disease and osteoarthritis and panic disorder.  According to the ALJ, however, the Claimant failed to meet part two of the standard prior to October 7, 2004 because the objective evidence confirmed neither the severity of the alleged symptoms nor that the conditions reasonably could be expected to cause the symptoms.  The ALJ also determined that Claimant's subjective complaints were incredible.

      The ALJ articulated in great detail the medical evidence and his reasons for both concluding that the pain standard was not met and that Claimant's subjective complaints were not credible.  In rejecting Claimant's subjective complaints of disabling pain, the ALJ properly

22

gave controlling weight to the opinion of Claimant's treating physician, Dr. Powers, who testified that, prior to October 7, 2004, the Claimant could stand and walk for four hours and sit for six hours, lift and carry up to twenty pounds occasionally, and lift and carry ten pounds frequently. He also opined that, prior to October 7, 2004, the Claimant had a mild restriction of activities, moderate difficulty with social interaction, mild difficulty maintaining concentration, persistence and pace, and no history of any episode of decompensation of extended duration. His conclusions were based upon all the Claimant's medical records dating back to July 6, 2001.

Dr. Powers' opinions were consistent with other medical findings, including those of Drs. Crouch, Clark, and Cornelius, and with Claimant's daily activities as reported by Dr. Wood. Although Claimant had not engaged in substantial gainful activity since his alleged onset date, he had worked intermittently at auto body shops—engaging in activities consistent with his other daily activities and Dr. Powers' stated limitations. Although Claimant visited multiple doctors and complained of pain on many occasions—a course Claimant calls a "longitudinal medical record"—at least one doctor expressly suspected that Claimant was a "drug seeker." In addition, the record indicates that Claimant did not always follow the recommended treatment, which undermines any credibility his repeated visits to the doctor might lend to his subjective complaints. In any event, substantial evidence established that, when Claimant did receive drugs, his pain was manageable.

The ALJ also carefully reviewed Claimant's mental health history and concluded that Claimant was not disabled prior to October 7, 2004 because of panic attacks. The ALJ could not find evidence in the medical records to suggest that the Claimant's mental illness would prevent gainful activity. (R. 37). The ALJ agreed that the Claimant had a somewhat limited ability to socially interact with others; however, the ALJ found that, so long as the Claimant was able to

obtain his medications (including Klonopin and opiate analgesics), he retained the ability to respond to the mental demands of the workplace.  (R. 37).

The ALJ did not find evidence from the medical records to suggest that, prior to October 7, 2004, the Claimant's pain or panic disorder would keep him from performing limited, light gainful activity.  (R. 35, 37).  Rather, the ALJ found that as a result of his panic disorder, chronic pain disorder, and Klonopin/Methadone/alcohol dependence, the Claimant had some limitation, but only at a moderate level.  To reach this determination, the ALJ relied on the medical evidence, considered Claimant's impairments both singly and in combination, and completed the PRTF.

The ALJ relied upon the medical records (including a state consultative psychological analysis performed in January 2002 by Dr. Wood), the December 2001 list of daily activities, the Claimant's own testimony as to his activities before and after the 2004 accident and the Claimant's own testimony as to the severity of his mental defect.  (R. 25, 37).  After the ALJ determined the Claimant's RFC, the vocational expert testified that, although the ALJ had determined that the Claimant could not return to his past relevant work, he could perform other limited light work jobs (assembler, inspector, and bagger) in significant numbers in the Alabama and national economies.  The ALJ then relied upon the Guidelines, in conjunction with the VE's assessment, to determine that the Claimant was not "under a disability" at any time prior to October 7, 2004.

The ALJ applied the proper legal standards to Claimant's subjective complaints.  The court also concludes that the ALJ's conclusions that the evidence as a whole did not meet the pain standard and that Claimant's complaints were not credible are supported by substantial evidence.  Accordingly, the court will AFFIRM the ALJ's decision that the Claimant was not

disabled prior to October 7, 2004.

### VII. Conclusion

For the reasons stated above, the court concludes that the 2001 application should not be reopened and the decision of the Commissioner is supported by substantial evidence, barred upon application of the proper legal standards, and is due to be AFFIRMED.  The court will enter a separate order consistent with this Memorandum Opinion.

DATED this 24th day of June, 2008.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE